## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOHN COFFIN and BARBARA PARSONS,

      Plaintiffs,

v.                              CASE NO: 8:04-cv-2669-T-26EAJ

CHRISTOPHER G. STEUBE, individually
and as Deputy Sheriff of the Manatee County
Sheriff's Office, KEITH V. SUTTON, individually
and as Deputy Sheriff of the Manatee County
Sheriff's Office, and CHARLES B. WELLS, as
Sheriff of Manatee County, Florida,

      Defendants.

_____/

## O R D E R

Before the Court is Defendant Deputy Keith Sutton's Motion for Summary

Judgment and incorporated Memorandum of Law with attachments, Statement of

Undisputed Facts, and four depositions (Dkts. 35-40, 46 & 47), and Plaintiffs' Response

in Opposition and Statement of Disputed Facts.  (Dkts. 50 & 51).  After careful

consideration of the parties' submissions and the entire file, the Court concludes that the

Motion should be granted.

### Claims and Parties

Plaintiffs John Coffin and Barbara Parsons, brother and sister, bring this § 1983

action for use of excessive force, making false or unlawful arrests, forceful and unlawful

entry into Parsons' home, and conspiracy to violate both Plaintiffs' civil rights, against two deputy sheriffs of Manatee County, Florida, in their individual and official capacities, and against the Sheriff of Manatee County in his official capacity.  The remainder of the complaint includes state law claims of battery, false arrest and imprisonment, and intentional infliction of emotional distress against the individual deputies, and negligent and inadequate supervision against Sheriff Wells.  All of the claims stem from Coffin's and Parsons' arrests on October 31, 2003, after a traffic stop by Deputy Christopher Steube.  Deputy Keith Sutton arrived at the scene after the stop was made to assist Deputy Steube in effectuating the arrest.  This summary judgment motion is brought solely on behalf of Deputy Sutton.

## Pertinent Facts

As is required in resolving a motion for summary judgment, the facts will be taken in the light most favorable to the non-moving parties, Plaintiffs.  Coffin testified at deposition that on October 31, 2003, he, his wife of twenty-seven years, and one of his sisters, Barbara Parsons, were riding to Parsons' home after visiting their mother in the hospital.  (Dkt. 38 at 10, 36-39).  He was driving his 2000 Oldsmobile Intrigue around 9:30 p.m. within the speed limit when Deputy Steube activated his overhead lights to pull him over.  (Dkt. 38 at 40-45).  Coffin pulled over into the driveway of Parsons' home.  (Dkt. 38 at 45).  Coffin then exited his car, at which point he claims he was still unaware that he was being pulled over.  (Dkt. 38 at 49).  Deputy Steube parked on the grass about twenty-five feet away from Coffin's car and exited the patrol car.  (Dkt. 38 at 50).  Coffin

-2-

inquired into why he was being stopped,[1] and Deputy Steube, standing behind the door of

his patrol car, told him to get back into his car. (Dkt. 38 at 51-52 & 54).  Coffin did not

get back into his car, but proceeded to explain to Deputy Steube that they lived there.

(Dkt. 38 at 58).  After he had turned around to look at his wife and Parsons in the car and

then turned back, Deputy Steube sprayed him with mace from six feet away.  (Dkt. 38 at

59-60 & 63-64).

Having been temporarily blinded by the mace, Coffin then retreated to the house.

(Dkt. 38 at 66).  When Coffin reached the door, Deputy Steube came toward him, radioed

that "he was stepping it up a level," and began hitting him with his asp.  (Dkt. 38 at 70 &

76).  He hit Coffin on his legs while Coffin was backing up into the house.  (Dkt. 38 at

79-81).  Coffin claims Deputy Steube hit Coffin approximately six times.[2]  (Dkt. 38 at

82).  He received the second hit after he started walking through the door.  (Dkt. 38 at

93).  When Parsons, who was already in the house, came to the door, Deputy Sutton had

arrived.  (Dkt. 38 at 86).  Parsons called 911 for a supervisor.  (Dkt. 38 at 87).

Coffin initially testified that Deputy Sutton arrived out of the blue with a can of

mace and sprayed him.  (Dkt. 38 at 92).  He later admitted that it was possible Deputy

Sutton told him he was under arrest before he sprayed him with the mace.  (Dkt. 38 at

---

[1]   The stop was premised on the license tag not matching the car— a false tag.
(Dkt. 40 at 19-22).  Coffin assumed the stop was premised on a faulty license plate light.
(Dkt. 38 at 208).

[2]   Deputy Steube's report indicates he hit him three times and sprayed him twice.
(Dkt. 40, Exh. 2).

190).  He then agreed that both deputies grabbed Coffin and he pulled away and struggled to prevent them from grabbing him again.  (Dkt. 38 at 190).  It was at this point that Deputy Sutton sprayed him with the mace, which had no effect.  (Dkt. 38 at 191).  At this time, Coffin was standing in the doorway and both deputies were outside the house.  (Dkt. 38 at 192).  Coffin and Parsons tried to shut the door, but both deputies pushed it back open with their bodies and came into the house.  (Dkt. 38 at 94-95).[3]  In any event, he acknowledged there was a struggle.  (Dkt. 38 at 194).  He also admitted that Deputy Sutton never yelled at him.  (Dkt. 38 at 196-197).

Coffin remembers Parsons' right arm being grabbed, but does not remember by which deputy.  (Dkt. 38 at 97-98).  When he told the deputy to release her, the deputy complied and Parsons fell backwards.  (Dkt. 38 at 99-100).  In the fray, Deputy Sutton jumped on Coffin's back, and Deputy Steube was hitting him.  (Dkt. 38 at 102).  Another K-9 officer came in and assisted Deputy Sutton in throwing Coffin to the floor.  (Dkt. 38 at 102).  A fourth officer, and perhaps a fifth, also came in through the door to assist in bringing Coffin to the floor.  (Dkt. 38 at 108-109).

Coffin testified that it was Deputy Steube who placed his asp in between his arm and rib cage to pry his arm out from underneath him to handcuff him.  (Dkt. 38 at 109-111 & 114).  He admitted that the officers did not treat him roughly when they took him to the squad car.  (Dkt. 38 at 115).  Parsons was handcuffed, but he did not witness the

---

[3]  He later testified that they walked into the house.  (Dkt. 38 at 192).

cuffing.  (Dkt. 38 at 121).  Coffin admits that Deputy Sutton never hit him with an asp.
(Dkt. 38 at 151).

After Coffin and Parsons were transported to the police station, they overheard
Deputies Steube and Sutton talking about writing up their reports.  (Dkt. 38 at 127).  The
deputies were talking about how many times Deputy Steube hit Coffin.  (Dkt. 38 at 129).
Deputy Steube told Deputy Sutton that he was going to say he hit Coffin three times, and
Deputy Sutton argued with him that he had hit Coffin more than three times, maybe even
six times.  (Dkt. 38 at 129-130).  Coffin heard them arguing about how Deputy Steube
was going to say he received his scratched arm from Coffin and Parsons, even though he
was not sure how his arm had been hurt.  (Dkt. 38 at 130).

With respect to the conversation between the two deputies at the police station,
Parsons corroborates Coffin's testimony.  Parsons testified at deposition that Deputies
Steube and Sutton used Wite-out frequently as they were writing up their reports about
twenty feet away from where she and Coffin were sitting.  (Dkt. 36 at 122-125).  She
recalled that when Deputy Sutton asked Deputy Steube how many times he was going to
say that he hit Coffin, Deputy Steube replied, "Three times."  (Dkt. 36 at 122; Dkt. 37 at
129-131).[4]  She stated that Deputy Sutton countered that he saw Deputy Steube hit Coffin
about five times and they began using the Wite-out on the reports.  (Dkt. 36 at 122).  As
to Deputy Steube's elbow, she testified that Deputy Steube told Deputy Sutton that he did

---

[4]  Parsons admitted that she witnessed only one hit and she heard two other hits
for a total of three.  (Dkt. 36 at 100; Dkt. 37 at 131).

not know how he received the injury but that he would blame it on Coffin.  (Dkt. 36 at 122).  Deputy Sutton told Deputy Steube that he could not misrepresent the injury.  (Dkt. 36 at 122).  Deputy Steube's report shows that he was not injured during the incident. (Dkt. 40, Exh. 2).

As far as Coffin's injuries, he testified that only his knee gave him "a little bit of pain" at times, but he had not seen any type of medical provider about it, nor did he intend to seek medical advice.  (Dkt. 38 at 146-147).  He was taken to the hospital for x-rays of his upper body some time after the incident, and he had no broken bones.  (Dkt. 38 at 169).  He claimed he was subjected to public scorn and ridicule as a result of the incident.  (Dkt. 38 at 148-149).  He testified that he is seeking psychological damages. (Dkt. 38 at 151).

Parsons testified that she received injuries to her wrist and cheek.  (Dkt. 36 at 118; Dkt. 37 at 150).  Her left cheek was accidentally injured by Deputy Steube when Coffin broke free from his grip, allowing Deputy Steube's fist to hit her cheek from the momentum.  (Dkt. 36 at 81).  She did not seek medical attention for those injuries.  (Dkt. 37 at 150).  She is also seeking psychological damages.  (Dkt. 37 at 151).

Deputy Sutton testified at deposition that when he arrived on the scene, he walked to Deputy Steube who told him that Coffin had resisted arrest and had been sprayed. (Dkt. 39 at 12-13).  Deputy Steube did not have his asp out, and Deputy Sutton did not remember whether Deputy Steube had his mace in his hand.  (Dkt. 39 at 12-13).  Deputy Sutton did not ask why Coffin was under arrest because it is not normally done or

required.  (Dkt. 39 at 15).  Coffin was in his doorway and refused to come out when Deputy Sutton told him he was under arrest.  (Dkt. 39 at 16).  Deputy Sutton testified that he then grabbed Coffin's arm, and Coffin hit his hand, which led him to reach for his pepper spray and spray him.  (Dkt. 39 at 16).

Both he and Deputy Steube were trying to take hold of Coffin to handcuff him, but the two of them were unable to accomplish the cuffing.  (Dkt. 39 at 18).  When Coffin was pulling away from them into the house, the two deputies were pulled into the house due to their grip on Coffin.  (Dkt. 39 at 19).  At this point, Deputy Steube hit Coffin on the leg with an asp.  (Dkt. 39 at 19-20).  Deputy Sutton did not recall how many times Deputy Steube hit Coffin with the asp.  (Dkt. 39 at 20).  Deputy Steube had to pry his one free arm from under Coffin's body.  (Dkt. 39 at 22). After the arrest had been effectuated, Deputy Sutton learned that Deputy Steube had misread the license plate number.[5]  (Dkt. 39 at 22).  Deputy Sutton dealt only with Coffin, and not Parsons, as was noted in his report.  (Dkt. 39 at 26).  His report makes note of only one time that Deputy Steube hit Coffin with his asp.  (Dkt. 40, Exh. 4).

### Excessive Force

---

[5]   Deputy Steube testified at his deposition that the license tag caught his attention because the first couple of numbers were either bent or dirty and were not clearly written. (Dkt. 40 at 18-19).  He typed the tag number into his laptop computer, and "no record found" came back.  (Dkt. 40 at 19-22).  He then initiated a stop to investigate a false tag. (Dkt. 40 at 22).  He testified that there was no other reason why he stopped the car.  (Dkt. 40 at 23-24).  Deputy Steube further testified that when Coffin exited his car and he told him to get back in his car, Coffin became belligerent and said, "Why did you stop me, get off my property and I want to see your supervisor."  (Dkt. 40 at 35).

Deputy Sutton urges that the "fellow officer rule" applies under the facts of this case to absolve him of any liability related to use of excessive force as to both Coffin and Parsons, citing Voorhees v. State, 699 So. 2d 602 (Fla. 1997).  He further argues that he did not use excessive force in any event, citing Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004).  Plaintiffs counter that the "fellow officer rule" is inapplicable, because there was no probable cause for the arrest from the outset as the stop was based on a misreading of the numbers and letters on Coffin's license plate.  Plaintiffs assert that fellow officers are charged with the collective knowledge of the Sheriff's department with respect to the validity of an arrest, and the knowledge of a fellow officer's mistake of law and fact.  They claim that Deputy Sutton should have intervened to stop Deputy Steube from using excessive force against Coffin and Parsons.

The "fellow officer rule" was first articulated in Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).  The rule permits an arresting officer to rely on information supplied by fellow officers to effectuate an arrest.  See Voorhees v. State, 699 So.2d 602, 609 (Fla. 1997).  Florida adopted this rule in Johnson v. State, 660 So.2d 648 (Fla. 1995), cert. denied, 517 U.S. 1159, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996), as follows:

> The issue here is whether an officer who himself lacks any
> personal knowledge to establish probable cause, who has not
> been directed to effect an arrest, and who does not know a
> valid warrant has been issued nevertheless can lawfully arrest
> a suspect.  In broad terms, the collective knowledge of police
> investigating a crime is imputed to each member under a rule
> of law often called the "fellow officer rule" or "collective

> knowledge doctrine." The exact contours of the rule are not
> entirely clear. Florida courts have tended to frame this
> doctrine in very sweeping terms, <u>e.g.</u>, <u>Carroll v. State</u>, 497
> So.2d 253 (Fla.3d DCA 1985), <u>review denied</u>, 511 So.2d 297
> (Fla. 1987), though we obviously are bound by any contrary
> federal law in the Fourth Amendment context.

<u>Johnson</u>, 660 So.2d at 657 (footnote omitted). The rule permits one officer who has the

power to arrest, but perhaps lacks the immediate ability to effectuate an arrest, to ask

another officer to make the arrest. <u>See</u> <u>State v. Boatman</u>, 901 So.2d 222, 224

(Fla.Dist.Ct.App. 2005).

The Florida Supreme Court further refined the rule by stating that "if the

information fails to support a legal arrest, evidence seized as a result of the arrest cannot

be insulated from challenge on the grounds that the instigating officer relied on

information furnished by fellow officers." <u>Voorhees</u>, 660 So.2d at 667. Generally, the

courts speak in terms of the "fellow officer rule" in connection with the exclusionary

rule— whether to suppress evidence in a criminal case collected as a result of an invalid

search or arrest. <u>See</u>, <u>e.g.</u>, <u>Dewberry v. State</u>, 905 So. 2d 963, 967 (Fla.Dist.Ct.App.

2005) (and cases cited therein). These cases make it clear that an arrest will be later

deemed invalid if the original officer relied on information later shown to be inaccurate.

<u>See</u> <u>Whiteley</u>, 401 U.S. at 569, <u>State v. White</u>, 660 So.2d 664, 667 (Fla. 1995) (holding

that the police department's failure to maintain up-to-date and accurate computer records

which resulted in an illegal arrest and search, falls squarely within the very negligent

conduct of police targeted by the exclusionary rule, regardless of the "fellow officer" or

"collective knowledge" rule); <u>Walker v. State</u>, 606 So.2d 1220, 1221 (Fla.Dist.Ct.App. 1992) (holding that "fellow officer rule" did not convert otherwise invalid arrest where information was miscommunicated by other officer and evidence obtained in search of vehicle should be suppressed); <u>Carroll</u>, 497 So. 2d at 260 (citing <u>Whiteley</u> as distinguishable because there, the officer initiating communication had no probable cause and therefore "illegal arrests cannot be insulated from challenge"); <u>Morejon v. State</u>, 431 So.2d 315, 316 (Fla.Dist.Ct.App. 1983) (holding that record did not support any evidence regarding basis for conclusion that vessel or house contained contraband).  None of these cases, however, involve § 1983 claims grounded in the Fourth Amendment's prohibition against unlawful arrests or arrests using excessive force.  Obviously, the exclusionary rule is not at issue in the present case.

Plaintiffs incorrectly focus on the point in time at which Deputy Steube mistakenly read the license tag.  Regardless of whether Deputy Steube improperly read the tag number, the circumstances changed once Deputy Steube pulled Coffin over and Coffin refused to obey the order from Deputy Steube to get back in his car.  Taking Coffin's side of the story as true, he turned away from Deputy Steube to look at Parsons and his wife in the car, and when he turned back around he was sprayed with mace.  Coffin freely admits he did not return to his vehicle as he was ordered.

Not only did Coffin not return to his vehicle, he fled to the door of Parsons' house to evade Deputy Steube.  At this point in time, Deputy Steube, at the very least, possessed probable cause to arrest Coffin for fleeing and evading an officer as resisting without

violence.  See R.H. v. State, 764 So.2d 762 (Fla.Dist.Ct.App. 2000).  With respect to

resisting with violence, it is well-established that an individual is not privileged to use

force or offer to do so against a law enforcement officer, even if the arrest is later deemed

illegal.  Cf. State v. Davis, 652 So.2d 942, 943 (Fla.Dist.Ct.App. 1995) (holding that

where individual pulled and struggled to free himself from officer and swung his fist at

officer, facts constituted prima facie case of violation of § 843.01 of the Florida Statutes).

Scuffling with an officer during an improper detention is not a defense to resisting arrest

with violence.  See Miller v. State, 636 So.2d 144, 151 (Fla.Dist.Ct.App. 1994).  Even

reading Coffin's deposition testimony in the light most favorable to him, Coffin fled from

an officer and attempted to enter Parsons' house and put up enough of a struggle or

enough resistance with force to prevent his being subdued.

       When Deputy Sutton arrived on the scene, it is eminently clear that he had not

witnessed any force used by Deputy Steube, and Coffin did not testify differently.  When

Deputy Sutton told Coffin he was under arrest,[6] Coffin did not submit to cuffing.  Deputy

Sutton responded by spraying mace on Coffin, which had no effect.  When Deputy Sutton

grabbed Coffin's arm in the doorway of the house, Coffin hit Deputy Sutton's hand and

successfully pulled away from Deputy Sutton's grasp.  The evidence at this point supports

the deputies' claim of Coffin's resist with violence, thereby obviating the need to rely on

the "fellow officer rule."

_____

       [6]  Coffin did not deny that Deputy Sutton told him he was under arrest.

Having determined that the "fellow officer rule" does not operate to vitiate the
need to apply some force to detain Coffin once Deputy Sutton arrived on the scene and
told Coffin he was under arrest, the Court will now analyze whether Deputy Sutton used
excessive force. The test for use of excessive force is set forth in <u>Priester v. City of
Riviera Beach</u>, 208 F.3d 919, 924 (11th Cir. 2000).  "Whether the amount of force used
was reasonable is determined objectively 'from the perspective of a reasonable officer on
the scene, rather than with 20/20 vision of hindsight' and requires 'careful attention to the
facts and circumstances of each particular case.'"  <u>Priester</u>, 208 F.3d at 924 (quoting
<u>Graham v. Connor</u>, 490 U.S. 386, 109 S.Ct. 1865, 1872 (1989)).  The factors to be
analyzed include (1) "the severity of the crime at issue," (2) "whether the suspect poses
an immediate threat to the safety of the officers or others," and (3) "whether he is actively
resisting arrest or attempting to evade arrest by flight."  <u>Id</u>.  The Court must look to the
totality of the circumstances "to determine whether the manner of arrest was reasonable."
<u>See</u> <u>Draper</u>, 369 F.3d at 1277.  "[I]n determining if force was reasonable, courts must
examine (1) the need for the application of force, (2) the relationship between the need
and amount of force used, and (3) the extent of the injury inflicted."  <u>Id.</u> at 1277-78
(quoting <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1198 (11th Cir. 2002)).  The force exerted by the
officer must be "reasonably proportionate to the need for that force" which is measured
by the three factors set forth in <u>Priester</u>.  <u>Lee</u>, 284 F.3d at 1198.

At the outset, the plaintiff in <u>Lee</u> did not actively resist or attempt to flee from the
arresting officer.  <u>Id.</u>, 284 F.3d at 1198.  Also, in <u>Lee</u>, the officer inflicted the injuries

after the plaintiff was handcuffed.  Id.  In Priester, the arrestee was already subdued and

on the ground when the officer released a police dog to attack.  Priester, 208 F.3d at 926-

27.  In Slicker v. Jackson, 215 F.3d 1225, 1227 (11th Cir. 2000), again, the officer kicked

and injured the arrestee *after* he had been secured.  There is no question that the cases

involving physical application of force *after* a suspect has been secured may easily fall

within the prohibited conduct defined as excessive force because the third factor—

actively resisting or attempting to evade arrest— cannot be satisfied.  That is not the case

here, however.

Having witnessed no use of excessive force on the part of Deputy Steube, Deputy

Sutton did not need to intervene to protect Coffin or Parsons.  Once Deputy Sutton

grabbed Coffin's arm and Coffin slapped at his hand, thereby pushing Deputy Sutton

away, Deputy Sutton was justified in spraying mace on Coffin to secure the arrest.  When

the pepper spray did not subdue Coffin, it was necessary to use stronger force.  The

resulting struggle in the house does not amount to more than *de minimis* force on the part

of Deputy Sutton and will not support a claim for excessive force.  See Durruthy v.

Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003).[7]  Clearly, the third factor of the test for use

of reasonable force has been satisfied.  Because Coffin was actively resisting arrest with

force in the doorway of the house and inside the house, the need and amount of force

---

[7]  See also Vinyard v. Wilson, 311 F.2d 1340, 1349 n. 13 (11th Cir. 2002) (holding that force used before arrest was *de minimis* and not excessive and cases cited therein such as Nolin v. Isbell, 207 F.3d 1253 (11th Cir. 2000), Jones v. City of Dothan, 121 F.3d 1456 (11th Cir. 1997), and Gold v. City of Miami, 121 F.3d 1442, 1444 (11th Cir. 1997)).

employed by Deputy Sutton in the manner of the arrest, under the totality of the circumstances, was reasonable.  Summary judgment must be entered in favor of Deputy Sutton on the claim of use of excessive force.

### Forceful Entry into Parsons' Home

To the extent Deputy Sutton entered Parsons' home to effectuate the arrest, Coffin's retreating into the house could not derail an otherwise valid arrest.  See United States v. Santana, 427 U.S. 38, 42, (1976) (holding that entering the suspect's house without a warrant following a retreating suspect could not thwart otherwise proper arrest); Gasset v. State, 490 So.2d 97 (Fla.Dist.Ct.App. 1986) (holding that entering suspect's garage and arresting him after engaged in high-speed chase was valid even though entry of home was warrantless).  Viewing the evidence in the light most favorable to Parsons, the record does not support a finding of a forceful entry.  Consequently, summary judgment should be entered in favor of Deputy Sutton on this count.

### Conspiracy

Officer Sutton's report and Officer Steube's report do not support a claim of conspiracy to violate Coffin and Parsons' civil rights.  Taking the conversations of the deputies overheard at the station house as true, the reports show that the deputies stated different numbers of times that Coffin was hit, and Deputy Steube's report does not report that he received any injuries.  The record is devoid of any evidence of a conspiracy, specifically no showing of an agreement between the Defendants to violate a constitutional right.  See Rowe v. Fort Lauderdale, 279 F.3d 1271, 1283-84 (11th Cir.

2002).  Thus, summary judgment should be entered in favor of Deputy Sutton on this

count.

### Qualified Immunity

Having granted summary judgment in favor of Deputy Sutton on the invalid arrest,

excessive force, and illegal entry claims under § 1983, the Court further finds that Deputy

Sutton should be granted qualified immunity to guard him individually from suit.  When

Deputy Sutton assisted in making Coffin's arrest, there is no question that he was acting

in his discretionary capacity as a deputy sheriff.  See Lee, 284 F.3d at 1194.  The

remaining two-part test requires that for each § 1983 claim, the Court must determine (1)

whether the deputy's conduct violated a constitutional right of the injured when the

injured party's version of the facts is taken as true, and (2) if such a right was violated,

whether that constitutional right was "clearly established" at the time of the incident.  Id.,

at 1194 (citing Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272

(2001)).  The "clearly established" law must be one established by the United States

Supreme Court, the Eleventh Circuit Court of Appeals or the Florida Supreme Court.

*Invalid or False Arrest of Coffin*[8]

First, the issue in a section § 1983 case is not whether there was probable cause for

an arrest, but whether there was *arguable* probable cause.  See Jones v. Cannon, 174 F.3d

1271, 1283 n. 3 (11th Cir. 2004).  Arguable probable cause requires only that the facts and

---

[8]   The record is clear that Deputy Sutton played no part in the arrest of Parsons.

circumstances be such that the officer reasonably believed probable cause existed.  Id.,

(citing Moutoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997)).  The inquiry is whether the

officer could have reasonably believed that probable cause existed based on the

information the officer possessed at the time.  Id.

When Deputy Sutton arrived on the scene, Deputy Steube told him that Coffin was

under arrest.  Relying on the information given to him by a fellow deputy, Deputy Sutton

told Coffin he was under arrest.  When Coffin resisted, Deputy Sutton certainly had

probable cause to arrest him, even if he had not been told by Deputy Steube to arrest

Coffin.  Thus, viewing the evidence in the light most favorable to Coffin, Deputy Sutton

must be granted qualified immunity.

*Excessive Force as to Coffin*[9]

As noted above with respect to the false arrest claim, Deputy Sutton understood

that Coffin was under arrest.  When Deputy Sutton informed Coffin he was under arrest

before attempting to cuff him, Coffin refused to submit to being cuffed.  Hence, Deputy

Sutton sprayed him with mace.  When this proved to be a fruitless gesture, Deputy Sutton

next grabbed his arm, and Coffin hit Deputy Sutton's hand, causing Deputy Sutton to lose

his grip.  Afterwards, Deputy Sutton jumped on Coffin's back in an attempt to wrestle

him down to handcuff him.  Because there is no "clearly established" law that this set of

---

[9]   Again, the record is clear that Deputy Sutton did not touch Parsons during the
incident.

facts would ever constitute excessive force, Deputy Sutton must be granted qualified immunity on this claim.

*Conspiracy*

The evidence did not establish a conspiracy to violate either Coffin's or Parsons' civil rights.  In any event, there is no "clearly established" law that prevents deputies from discussing their arrests in the station house before filling out their respective reports. Here, the reports reveal that no agreement was reached between Deputies Sutton and Steube, much less an agreement to violated anyone's civil rights.

*Forced Entry into Parsons' Home*

Deputy Sutton candidly discusses that Deputy Steube arguably may not have had probable cause to arrest Coffin outside of the house, and therefore would have had no probable cause to arrest Coffin inside the house.  Nevertheless, this motion is brought by Deputy Sutton and not Deputy Steube.  Consequently, when Deputy Sutton, operating on Deputy Steube's direction to arrest Coffin, attempted to arrest Coffin, the ensuing struggle and retreat into the house on the part of Coffin gave Deputy Sutton the right to enter the house to effectuate the arrest.  The circumstances at this moment were no doubt exigent and created by Coffin.  Having no reported authoritative law that prevented Deputy Sutton from following a retreating arrestee into a house, this Court cannot say that Deputy Sutton violated a "clearly established" law.  Qualified immunity must be granted on this claim.

**Pendant State Law Claims Against Deputy Sutton**

Federal law permits, and even encourages, district courts to refrain from ruling on purely matters of state law under supplemental jurisdiction.  See 28 U.S.C. § 1367(c)(3); Baggett v. First Nat'l Bank, 117 F.3d 1342, 1353 (11th Cir. 1997) (holding that dismissal of state law claims is strongly encouraged where the federal claims are dismissed prior to trial).  Where the Court declines to exercise supplemental jurisdiction over such claims, the claims should be dismissed without prejudice so they can be refiled in the appropriate state court.  See Crosby v Paulk, 187 F.3d 1339, 1352 (11th Cir. 1999).  Resolving that Plaintiffs will suffer no harm by this Court's declining to exercise its supplemental jurisdiction, and in the interest of judicial economy and convenience, the Court declines to exercise supplemental jurisdiction over the remaining state law claims in this action.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1)     Defendant Deputy Keith Sutton's Motion for Summary Judgment (Dkt. 46) is **GRANTED**.

(2)     At the close of this case, the Clerk shall enter judgment in favor of Defendant Deputy Keith Sutton and against Plaintiffs on all § 1983 claims.

(3)     All state law claims against Deputy Sutton shall be dismissed without prejudice to refiling in state court.

**DONE AND ORDERED** at Tampa, Florida, on May 2, 2006.


    s/*Richard A. Lazzara*
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**

-18-

**COPIES FURNISHED TO**:
Counsel of Record